UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DeVONTÉ MOORER,

                                 Petitioner,

                                                           Case # 23-CV-6656-FPG
v.                                                     DECISION AND ORDER

DONALD UHLER,

                                 Respondent.

## INTRODUCTION

Pursuant to 28 U.S.C. § 2254, *pro se* Petitioner DeVonté Moorer brings this habeas petition to challenge his state-court conviction for first-degree manslaughter. ECF No. 1. Respondent Donald Uhler opposes the petition. For the reasons that follow, Petitioner's request for habeas relief is DENIED, and the petition is DISMISSED.

## BACKGROUND

In December 2011, Petitioner was indicted on the charge of second-degree murder, in violation of N.Y. Penal Law § 125.25(1). ECF No. 22-1 at 53. The indictment alleged that, on June 26, 2011, Petitioner had stabbed the victim, Calvin Reid, to death. *Id.*

The case proceeded to a bench trial before County Court Judge John L. DeMarco. ECF No. 29 at 247, 270. The Court will summarize the relevant evidence submitted during the trial.

On June 26, 2011, at approximately 12:15 AM, Officer Jeremy Nellist of the Rochester Police Department responded to a report of a stabbing outside of a minimart on Hudson Avenue. *Id.* at 294. When he arrived, he noticed a large crowd in the street. *Id.* He walked over to the crowd and saw a man—later identified as Calvin Reid—"laying on the hood of a car" with his "back down." *Id.* A woman was holding Reid's "stomach area," and Officer Nellist noticed that

"it had appeared that [Reid] had been stabbed." *Id.* Reid was taken to Strong Memorial Hospital, where he ultimately succumbed to his injuries. *See id.* at 295, 301, 473.

Security footage from inside and outside of the minimart was admitted into evidence. ECF No. 29 at 371-72. It revealed the events prior to the attack.

At 11:17 PM, Calvin Reid—a Black man with a shaved head who is wearing a solid red hoodie, light-blue jeans, and white shoes—walks by the outside of the minimart. Following behind him at a short distance is another Black man with a shaved head. This man is wearing a red-hooded sweatshirt with "Bugs Bunny" markings and a black t-shirt underneath, red sweatpants, black shoes, and a tan knapsack. At trial, the man would be identified as "D." ECF No. 29 at 511. Rather than continuing to walk behind Reid, "D" proceeds into the minimart. He makes no purchases. Instead, he waits by the door and chats with two other individuals. Soon, Reid walks into the minimart before exiting. "D" continues to chat with the other two individuals, while occasionally glancing outside. Reid can be seen walking back and forth in front of the minimart. At 11:23 PM, a cashier directs "D" to leave. *See* ECF No. 29 at 383-84. "D" exits the minimart and stands by the entryway. A suspicious interaction then occurs: There is a third Black man in a red hoodie who is loitering outside the minimart. When that man walks around the corner of the minimart, "D" follows behind him. But just as "D" rounds the corner, the man turns back and returns to the front of the minimart. "D" turns around as well, and slowly walks back towards the front of the minimart. One could reasonably infer that "D" had been attempting to follow this third man.

Thereafter, neither "D," nor Reid, nor the third man can be seen on the security footage for over a half-hour. At 12:05 PM, Reid and the third man return to the front of the minimart. At 12:12 AM, Reid enters the minimart. One minute later, Reid exits and stands on the sidewalk in

2

front of the minimart. As a crowd passes by him, suddenly a Black man in a black t-shirt, red sweatpants, and black shoes thrusts his right arm towards Reid's chest. The pair struggle, veering into the street, before the man in the black t-shirt withdraws and sprints away from the minimart. A knife can be seen in his right hand.

A Crime Information Bulletin was issued by the Rochester Police Department. ECF No. 29 at 424-25. The bulletin included still images of the security footage from the minimart. *See* ECF No. 29 at 425. On June 28, 2011, Robert Osipovitch, a police officer with the Rochester Police Department, recognized "D" as Petitioner, a person he knew from a prior encounter in November 2010. *See id.* at 425-27. During that encounter, Petitioner wore a distinctive red hoodie with "Bugs Bunny" markings on it. *Id.* at 432; *see also* ECF No. 22-1 at 350.

Catherine Lucci, an investigator with the Rochester Police Department, became involved in the investigation. ECF No. 29 at 316. On July 1, 2011, she was investigating a lead at 15 Zimbrich Street in Rochester, which is located less than one mile from the minimart. *Id.* at 320. She obtained a resident's consent to search the location, and, during the search, police called a phone number that they believed was associated with Petitioner. *Id.* at 322. Upon calling the number, a cell phone rang from within a knapsack that was underneath a bed located on the front porch of the residence. *Id.*; ECF No. 22-1 at 339. Written on the knapsack in red marker is "Ave D" and "Hudson." ECF No. 29 at 326; ECF No. 22-1 at 342. The word "DUTCH" is also scrawled on the knapsack. ECF No. 29 at 326; ECF No. 22-1 at 344. In the knapsack was a cell phone and Petitioner's learner's permit. *See* ECF No. 22-1 at 346-47; ECF No. 29 at 327. The cell phone contained a picture of Petitioner and materials referencing the nickname "Dutch." ECF No. 29 at 338-39.

3

Judge DeMarco found Petitioner guilty of the lesser-included offense of first-degree manslaughter, ECF No. 29 at 573, and sentenced Petitioner to a determinate term of 23.5 years' imprisonment. *Id.* at 604.

Petitioner appealed, arguing (1) officers conducted an unconstitutional, warrantless search by "pinging" his cell phone; (2) officers unconstitutionally seized and searched the backpack found at 15 Zimbrich Street; and (3) the sentence was harsh and excessive. ECF No. 22-1 at 13-14, 49. The Appellate Division, Fourth Department, affirmed Petitioner's conviction. ECF No. 22-1 at 403-04. Petitioner sought leave to appeal, which the New York Court of Appeals denied on June 29, 2018. *Id.* at 406-15.

On February 25, 2019, Petitioner filed a §440.10 motion, arguing that the "pinging" of his cell phone was unconstitutional in light of *Carpenter v. United States*, 585 U.S. 296 (2018). ECF No. 22-1 at 416-50. Judge DeMarco denied the motion on July 11, 2019. ECF No. 22-1 at 458-62. Petitioner sought leave to appeal the order, which the Fourth Department denied on October 22, 2019. *Id.* at 463-75.

More than sixteen months later, on March 18, 2021, Petitioner received a letter—dated March 12, 2021—from the Monroe County District Attorney's Office. ECF No. 22-2 at 45; *see also* ECF No. 22-1 at 496. The letter informed Petitioner that "[a]n internal review of our office records" had "revealed additional impeachment material regarding Rochester Police Officer Robert Osipovitch." ECF No. 22-2 at 45. This material "may not have been disclosed to you" as required. *Id.* The impeachment material pertained to two incidents bearing on Officer Osipovitch's credibility. First, on September 19, 2011, a Supreme Court justice dismissed an indictment after concluding that a search in which Officer Osipovitch was involved was unconstitutional. *Id.* With respect to Officer Osipovitch's testimony, the justice wrote that he had

4

"attempted to tailor his testimony so as to nullify constitutional objections to what was not a narrowly circumscribed search." *Id.* Second, on July 27, 2011, Officer Osipovitch gave sworn testimony relating to a traffic stop that was later contradicted by surveillance video. *See id.* at 47.

On July 28, 2021, Petitioner filed another § 440.10 motion premised on the government's failure to disclose this impeachment evidence. ECF No. 22-1 at 489-504. On October 28, 2021, then-Monroe County Court Judge Meredith A. Vacca denied the motion. ECF No. 22-1 at 513-16. Petitioner sought leave to appeal, which the Fourth Department denied on November 17, 2022. ECF No. 22-2 at 58.

Less than one month later, Petitioner filed another § 440.10 motion raising similar arguments. ECF No. 22-2 at 61-107. That motion was denied, *id.* at 148-53, as was Petitioner's request for leave to appeal. *Id.* at 169. On October 20, 2023, Petitioner filed the present action. ECF No. 1.

## LEGAL STANDARD

28 U.S.C. § 2254 allows a petitioner to challenge his imprisonment from a state criminal judgment on the ground that it is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where the petitioner raises a claim that was adjudicated in state-court proceedings, he is only entitled to relief if that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1), (2).

"A principle is 'clearly established Federal law' for § 2254(d)(1) purposes only when it is embodied in a Supreme Court holding, framed at the appropriate level of generality." *Washington*

*v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (internal quotation marks, brackets, and citations omitted).  "A state court decision is 'contrary to' such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law or has decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Id.* (internal quotation marks omitted).  "An unreasonable application occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case, so that the state court's ruling on the claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (internal quotation marks and ellipses omitted).

In analyzing a habeas claim, "[f]ederal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with clear and convincing evidence." *Hughes v. Sheahan*, 312 F. Supp. 3d 306, 318 (N.D.N.Y. 2018) (internal quotation marks omitted).  "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Id.* Because the Court of Appeals denied Petitioner's request for review, the Court's review focuses on the Appellate Division's decision. *See Licausi v. Griffin*, 460 F. Supp. 3d 242, 258 (E.D.N.Y. 2020) ("Courts examine the 'last reasoned decision' by the state courts in determining whether a federal claim was adjudicated on the merits.").

Where, as here, the petitioner is proceeding *pro se*, the district court must read the pleadings liberally and construe them "to raise the strongest arguments they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

## DISCUSSION

Petitioner contests his conviction on, in substance, three grounds.[1] First, Petitioner's Fourth Amendment rights were violated with respect to investigators' use of cell-site location information. Second, Petitioner's trial counsel provided ineffective assistance by failing to present misidentification evidence—specifically, that Petitioner, unlike the assailant in the security footage, has a "full sleeve of tattoos on his right arm." ECF No. 1 at 17. Third, the prosecution breached its *Brady* obligations by suppressing impeachment evidence concerning Officer Osipovitch, thereby causing the violation of several of Petitioner's constitutional rights.

The Court addresses each ground in turn.

### I.  The First and Second Grounds are Untimely

Petitioner's Fourth-Amendment and ineffective-assistance claims are untimely and, therefore, cannot be the basis for habeas relief.

Under 28 U.S.C. § 2244(d)(1), a one-year period of limitations applies to an application for a writ of habeas corpus by a person in custody pursuant to a judgment of a state court. 28 U.S.C. § 2244(d)(1). The limitation period runs from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the [United States] Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

---

[1] Petitioner organizes his petition into nine claims, *see generally* ECF No. 1, but many of the claims significantly overlap.

28 U.S.C. § 2244(d)(1)(A)-(D).  The Court must assess the timeliness of each of Petitioner's claims separately.  *See Bonner v. Superintendent, Five Points Corr'l Facility*, No. 20-CV-6906, 2021 WL 1946703, at *4 (W.D.N.Y. May 14, 2021) (concluding that courts must assess the timeliness of habeas claims "on a claim-by-claim basis").

Under subsection (A), Petitioner's first and second claims are untimely.  On direct appeal, the Court of Appeals denied Petitioner's request for leave to appeal on June 29, 2018.  ECF No. 22-1 at 415.  Petitioner then had ninety days to seek direct review in the United States Supreme Court, *see Cosey v. Lilley*, No. 18-CV-11260, 2020 WL 2539065, at *13 n.12 (S.D.N.Y. May 19, 2020), which he did not pursue. Therefore, Petitioner's conviction became final at the expiration of that ninety-day period—September 27, 2018.  For purposes of subsection (A), the clock began running on that date.

151 days passed before Petitioner filed a § 440.10 motion dated February 25, 2019.  *See* ECF No. 22-1 at 416.  As a result, the one-year limitations period was tolled until October 22, 2019, when the Fourth Department denied Petitioner's application for leave to appeal the denial of his motion.  *See* ECF No. 22-1 at 475; 28 U.S.C. § 2244(d)(2) (stating that the limitations clock is tolled for any period "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent . . . claim is pending"); *Cosey v. Lilley*, 460 F. Supp. 3d 346, 370 (S.D.N.Y. 2020).  The limitations period expired 214 days later, on May 23, 2020. *Olivero v. Fischer*, No. 04-CV-280, 2004 WL 1202934, at *1-2 (W.D.N.Y. June 1, 2004).

Petitioner did not take any action on his post-conviction challenges until July 28, 2021, when he filed another § 440.10 motion—more than 14 months after the expiration date.  *See* ECF No. 22-1 at 489.  By that time, however, his Fourth-Amendment and ineffective-assistance claims were untimely under subsection (A), and the new § 440.10 motion could not revive them.  *See*

*King v. Lee*, No. 11-CV-213, 2012 WL 1038562, at *2-3 (W.D.N.Y. Mar. 27, 2012). Because Petitioner does not argue that subsection (B)-(D) apply to his Fourth-Amendment or ineffective-assistance claims, grounds one and two must be deemed untimely.[2]

To avoid the dismissal of these claims, Petitioner invokes the doctrine of equitable tolling. In "rare and exceptional circumstances" a district court may exercise its equity powers to "toll the statute of limitations." *Cohen v. Superintendent of Sing Sing Corr'l Facility*, No. 22-CV-2553, 2022 WL 2704509, at *3 (E.D.N.Y. July 8, 2022). The standard is strict:

> Equitable tolling is only appropriate when the petitioner establishes (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing. A petitioner need only pursue his rights under a standard that calls for reasonable diligence, not maximum feasible diligence. The exercise of reasonable diligence is directly tied to the causation analysis necessary to determine what the actual cause of a petitioner's untimeliness was. The petitioner must demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing. It follows that if the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken.

*Id.* (internal citations, quotation marks, and brackets omitted).

Petitioner has not made the requisite showing. In his original petition, the only grounds he raised for his untimeliness pertained to the COVID-19 pandemic. *See* ECF No. 1 at 38. He states that he contracted the virus on three occasions, during which time his movement was restricted and he was quarantined, preventing his access to the law library. *Id.* He recuperated in March 2021, when he received the impeachment materials from the government. *Id.*

---

[2] The Court notes that these grounds are unrelated to the nondisclosure of Officer Osipovitch's adverse credibility findings, and so the subsequent disclosure of that information could not revive these grounds under Section 2244(d)(1)(D). *See Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (stating that "if new information is discovered that merely supports or strengthens a claim that could have been properly stated without the discovery, that information is not a 'factual predicate' for purposes of triggering the statute of limitations under § 2244(d)(1)(D)").

Because the pandemic did not begin in earnest until March 2020—by which time Petitioner had let more than four months elapse without taking any action—there is reason to doubt Petitioner's excuse on its face. Regardless, the mere "existence" of the pandemic is "not alone sufficient to warrant equitable tolling." *Cohen*, 2022 WL 2704509, at *3. Petitioner states little more than that he contracted the illness "three separate times." ECF No. 1 at 38. Petitioner fails to articulate how three bouts of COVID-19 could explain a 14-month delay in pursuing relief. *Cf. Rios v. Mazzuca*, 78 F. App'x 742, 744 (2d Cir. 2003) (summary order) (noting that, in the case of mental illness, a petitioner must provide "a particularized description of how his condition adversely affected his capacity to function generally or in relationship to the pursuit of his rights" (internal quotation marks and brackets omitted)). Likewise, though Petitioner argues that the pandemic caused restricted movement and interfered with his ability to go to the law library, he does not elaborate on (a) the dates of those restrictions, or (b) why he needed law-library access to prepare his habeas petition. On this latter point, the Court observes that Petitioner's original petition contains no developed legal argument that would suggest a reliance on, or need for, law-library access. *See Mairs v. Fields*, No. 20-CV-1451, 2021 WL 4311140, at *3 (E.D.N.Y. Sept. 22, 2021) (denying equitable tolling where "each ground for relief [in the habeas petition was] just a few sentences long" and the petitioner "made no legal arguments that would have required lengthy library access prior to submission"). In short, Petitioner has failed to "show why he is entitled to equitable tolling on the basis of the COVID-19 pandemic." *Cottell v. Reardon*, No. 22-CV-1178, 2023 WL 3852384, at *4 (S.D.N.Y. Mar. 10, 2023).

In his reply brief, Petitioner raises a new argument. For the first time, Petitioner alleges that his delay was caused by a person named "Daniel Miller," who is associated with an entity called "Post-Conviction Associates":

> Petitioner had been pursuing his rights diligently throughout the time period which respondent claims petitioners [sic] arguments are time barred. Petitioner, at that time, had hired "Post-Conviction Associates" Daniel Miller to draft and file petitioner's first post-conviction 440 motion and a proposed habeas corpus petition however due to COVID-19 and the restrictions that followed prevented Daniel Miller from properly assisting petitioner file said documents. All the while, Petitioner was being re-assured time and time again via telephone by Daniel Miller that we could easily seek equitable tolling, especially since petitioner was sick from contracting COVID-19 himself and the fact that the law library in the facility he was in was either shut-down consecutively or the materials were not being delivered to said facility due to the restrictions within society.

ECF No. 30 at 8-9; *see also Nickels v. Conway*, 480 F. App'x 54, 56 (2d Cir. 2012) (summary order) (noting that attorney error "may be so outrageous or so incompetent" as to constitute "extraordinary circumstances warranting equitable tolling").

Leaving aside the fact that Petitioner failed to disclose Miller's involvement in his original petition—and fails to submit any documentation to corroborate his claims—several discrepancies are immediately apparent. Petitioner writes that he hired Miller to file his first § 440 motion, but the first § 440 motion in the record indicates that Petitioner filed it *pro se*. *See* ECF No. 22-1 at 417. Daniel Miller is referenced in that filing, but only as the individual who served Petitioner's motion. *See id.* at 450.

Furthermore, Petitioner filed that first § 440 motion more than one year before the outbreak of the pandemic, so the Court fails to understand how the pandemic would have "prevented Daniel Miller from properly assisting [P]etitioner" during the pre-pandemic period. ECF No. 30 at 8. There is also a lack of clarity about what exactly Miller's role was: Petitioner suggests that Miller was somehow providing him legal advice regarding his post-conviction challenges, yet Petitioner simultaneously claims he *personally* needed law-library access to conduct (unidentified) legal research.

In sum, Petitioner presents no more than "conclusory factual statements," which are insufficient to satisfy his burden "to establish the appropriateness of equitable tolling." *Green v. Sheehan*, No. 12-CV-665, 2012 WL 3561978, at *2 (W.D.N.Y. Aug. 13, 2012); *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) (stating that equitable tolling is not available for "conclusory and vague" claims of extraordinary circumstances).

To the extent Petitioner requests that the Court excuse his untimeliness on the basis that he is actually innocent, the Court declines to do so. *See* ECF No. 1 at 24-25. The Supreme Court has recognized an "actual innocence exception to the one-year time limit," under which a petitioner may pursue a habeas claim "on the merits notwithstanding the existence of a procedural bar to relief." *Cosey v. Lilley*, 62 F.4th 74, 77 (2d Cir. 2023). "Actual innocence [] excuses procedural default only when a petitioner comes forward with new evidence and shows that it is more likely than not that no reasonable juror aware of that evidence would have convicted him." *Rajaratnam v. United States*, 736 F. App'x 279, 282 (2d Cir. 2018) (summary order) (internal quotation marks omitted).

In this case, the only "new" evidence that Petitioner presents is (a) Officer Osipovitch's adverse-credibility findings, and (b) his allegation that his "whole right arm [was] covered in tattoos well before the homicide occurred." ECF No. 1 at 24-25. Whether considered alone or together, this evidence does not meet the "demanding" standard for "making a gateway showing of actual innocence." *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019). As the Court discusses below, with respect to Officer Osipovitch's adverse-credibility findings, such evidence is immaterial for *Brady* purposes. "It necessarily follows that this impeachment evidence does not indicate Petitioner's actual, factual innocence, much less do so compellingly." *Smith v. Noeth*, No. 18-CV-883, 2023 WL 4936942, at *29 (W.D.N.Y. June 27, 2023).

With respect to the tattoos, Petitioner fails to persuasively substantiate his allegations. Granted, there is documentation in the record that, at the time of the underlying events, Petitioner had a tattoo on his right arm: a contemporaneous prisoner data sheet describes the tattoo as follows: "'Yourlanda' Right Arm." ECF No. 22-1 at 60. Beyond that vague description, the data sheet provides no details regarding the size, color, or extent of Petitioner's tattoo(s). And Petitioner has not provided any photographic evidence concerning his tattoos; he merely asserts, without evidence, that his tattoos would have been visible on the security footage and that, because they are not, he has established his misidentification defense. *See* ECF No. 1 at 17. Petitioner's "self-serving" and "conclusory" assertion is not "compelling proof of innocence."[3]  *Ramos v. Cunningham*, No. 15-CV-3755, 2016 WL 4467559, at *4 (S.D.N.Y. Aug. 22, 2016).

In sum, Petitioner's Fourth-Amendment and ineffective-assistance claims are untimely; there is no basis for equitable tolling; and Petitioner has failed to substantiate a claim of actual innocence.[4] Accordingly, these claims are dismissed as untimely.

## II. The Third Ground Lacks Merits

In March 2021, Petitioner received a letter from the Monroe County District Attorney's Conviction Integrity Unit. ECF No. 22-2 at 108. That letter disclosed "additional impeachment material regarding" Officer Osipovitch. *Id.* Specifically, in two unrelated criminal matters in 2011, state-court judges had found Officer Osipovitch's testimony not credible and had suppressed evidence as a result. *See id.* at 109-10.

---

[3] The Court also observes that Petitioner's present claim of actual innocence is inconsistent with his prior statements at sentencing, during which he stated that he will "hold [the victim's] death on [his] shoulders for the rest of [his] life" and that he was "sorry that this all has happened." ECF No. 29 at 598; *see also Cobaugh v. Kaplan*, No. 12-CV-1798, 2013 WL 6510751, at *5 (N.D.N.Y. Dec. 11, 2013) (rejecting conclusory claim of actual innocence in light of, *inter alia*, the petitioner's statement at her sentencing hearing: "I accept responsibility for my role in [the victim's] death").

[4] To the extent Petitioner raises a freestanding claim of actual innocence, *see* ECF No. 1 at 24, it necessarily fails because he cannot even meet the less demanding standard for "actual innocence" in the timeliness context. *See Jimenez v. Stanford*, 96 F.4th 164, 194 (2d Cir. 2024).

13

Petitioner argues that the government's failure to disclose this impeachment evidence earlier violated several of his constitutional rights.

First, Petitioner contends that the nondisclosure violated his rights under the seminal decision of *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner has not established a *Brady* violation.

The standard under *Brady* "and related authorities" is "well-established":

> [I]n a criminal prosecution, the government has an affirmative duty under the Due Process Clause to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense. If this obligation is violated, the district court may grant a new trial. That said, not all instances of governmental nondisclosure violate *Brady*, or warrant such relief. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. In other words, true *Brady* material must be (1) favorable, (2) suppressed, and (3) prejudicial.

*United States v. Hunter*, 32 F.4th 22, 30-31 (2d Cir. 2022) (internal quotation marks and footnotes omitted). "The government's failure to produce evidence is prejudicial and thereby violates a defendant's rights under *Brady* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016).

"The evidence whose disclosure is required under *Brady* may consist not only of exculpatory evidence but also of impeachment evidence." *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995). Nondisclosure of impeachment evidence is considered prejudicial "where the witness at issue supplied the only evidence linking the defendant[] to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *Id.* (internal citations and quotation marks omitted). "In contrast, a new trial is generally not required when the testimony of the witness is corroborated by other testimony, or

14

when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Id.* (internal quotation marks and citations omitted).

Petitioner raised this claim in a § 440 motion, which the county court reasonably rejected. Officer Osipovitch's testimony at trial was limited. After the stabbing, the Rochester Police Department issued a Crime Information Bulletin that included images of the security footage and the suspect. *See* ECF No. 29 at 424-25. At trial, Officer Osipovitch attempted to testify that he recognized Petitioner as the person in the bulletin and security footage, based on a prior encounter he had with Petitioner in November 2010. But because defense counsel objected, Officer Osipovitch's testimony was only permitted to the extent it demonstrated that Officer Osipovitch had previously interacted with Petitioner in November 2010. *See id.* at 428, 452, 461. And, through Officer Osipovitch, the prosecution was able to admit photographs showing that, on that night in November 2010, Petitioner was wearing a distinctive red "Looney Tunes" hoodie. *See id.* at 431-32; ECF No. 22-1 at 350. Thus, at most, Officer Osipovitch's testimony provided the foundation for the admission of the photographs, which then provided the link between the person in the security footage (who was wearing a distinctive "Looney Tunes" hoodie) to Petitioner (who also possessed a distinctive "Looney Tunes" hoodie).

Though this link was undoubtedly relevant to identifying Petitioner as the perpetrator, Officer Osipovitch merely provided a foundation for the admission of the photographs; his personal reliability or credibility as a percipient witness was not meaningfully at issue. Indeed, Petitioner raises no dispute that Officer Osipovitch did, in fact, interact with Petitioner in November 2010 and that the admitted photographs accurately depict him and the hoodie he

possessed at that time.[5] *See* ECF No. 22-1 at 497 (admitting that Officer Osipovitch had "arrested [Petitioner] previously[] on an unrelated charge"). The county court therefore reasonably concluded that Officer Osipovitch's "limited trial testimony," which was "corroborated by photographs," was such that the late-disclosed impeachment evidence was immaterial for *Brady* purposes. ECF No. 22-2 at 157; *cf. Fernandez v. Capra*, 916 F.3d 215, 224 (2d Cir. 2019) (impeachment evidence concerning testifying officer was not material for *Brady* purposes where officer's testimony was "ministerial in nature"). In none of his filings does Petitioner articulate a viable theory as to how a more robust challenge to Officer Osipovitch's credibility could have affected the outcome of the trial.

Second, Petitioner claims that the nondisclosure tainted the grand-jury proceedings.[6] *See* ECF No. 1 at 15. The Court may grant that Petitioner arguably makes a stronger case for prejudice with respect to Officer Osipovitch's grand jury testimony: unlike at trial, Officer Osipovitch affirmatively testified before the grand jury that he had reviewed the security footage and recognized Petitioner as the perpetrator. *See* ECF No. 22-2 at 128-31. But even if Officer Osipovitch's credibility was placed more directly at issue before the grand jury, the nondisclosure of Osipovitch's adverse credibility findings in other cases did not taint the grand-jury proceedings. This is because the government has "no obligation to present exculpatory material," including impeachment material, "to a grand jury." *United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (rejecting claim that grand jury proceedings were tainted by government's "failure to inform the Grand Jury of the [witnesses'] criminal histories and general untrustworthiness"); *see also*

---

[5] For that reason, Petitioner's accusation that Officer Osipovitch knowingly misidentified him as the perpetrator at trial is incorrect. *See* ECF No. 1 at 33 (alleging that "perjured testimony [was] knowingly used by [the] prosecution").

[6] To the extent Petitioner's argument is that the nondisclosure violated his Sixth Amendment right of confrontation, *see* ECF No. 1 at 14-15, that argument does not merit habeas relief. *See McCray v. Capra*, 45 F.4th 634, 646 (2d Cir. 2022) (denying habeas relief after concluding that Supreme Court precedent does not clearly establish a right to pretrial discovery under the Confrontation Clause).

*United States v. Haynes*, 216 F.3d 789, 798 (9th Cir. 2000) (rejecting a challenge "to the government's failure to introduce evidence impugning [a grand jury witness's credibility]" because "prosecutors have no obligations to disclose substantial exculpatory evidence to a grand jury, even if that evidence impeaches the credibility of a key witness" (internal quotation marks and citation omitted)). Because the prosecution was under no obligation to disclose Officer Osipovitch's adverse credibility findings to the grand jury, its nondisclosure cannot be deemed to have tainted the grand jury proceedings.

Third, Petitioner argues that the nondisclosure of the adverse credibility findings rendered his waiver of the right to a jury trial involuntary. ECF No. 1 at 19. This argument fails under the logic of *United States v. Ruiz*, 536 U.S. 622 (2002). There, the Supreme Court held that the Constitution does not require the "preguilty plea disclosure of impeachment information." *Ruiz*, 536 U.S. at 629. A defendant's *Brady* right to "exculpatory impeachment material" is founded upon the Constitution's "fair trial guarantee." *Ruiz*, 536 U.S. at 628 (internal quotation marks omitted). That is, "impeachment information is special in relation to the *fairness of a trial*," not in relation to whether a defendant voluntarily chooses to forgo other, related constitutional guarantees in the criminal process, like pleading guilty. *Id.* at 629. All that is required to make a plea constitutionally valid is that the defendant "fully understand[] the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." *Id.* For example, a defendant "may waive . . . his right to a jury trial . . . even if the defendant does not know the specific questions the authorities intend to ask, who will likely serve on the jury, or the particular lawyer the State might otherwise provide." *Id.* at 629-30. The Second Circuit had expressly applied *Ruiz*'s logic to the waiver of the right to a jury trial. *See United States v. Mason*, 201 F. App'x 22, 24 (2d Cir. 2006) (summary

17

order) ("[A] defendant's waiver of a jury trial is not affected by a lack of knowledge regarding evidence that could be used to impeach a witness at trial."). Accordingly, this argument has no merit.

In sum, Petitioner has failed to demonstrate that the nondisclosure of Officer Osipovitch's adverse-credibility findings violated any of his constitutional rights.

## CONCLUSION

Petitioner's request for habeas relief is DENIED and his petition (ECF No. 1) is DISMISSED. Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is DENIED. The Clerk of Court shall close the case. Petitioner's motion for appointment of counsel (ECF No. 33) is DENIED AS MOOT.[7]

IT IS SO ORDERED.

Dated: May 29, 2025
Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

---

[7] Recently, Petitioner submitted a letter notifying the Court that he had been "stabbed in the face and neck." ECF No. 32 at 1. It does not appear that Petitioner is seeking any affirmative relief in connection with this notification.